# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF GEORGIA
# VALDOSTA DIVISION

| | | |
|---|---|---|
| **JOWELL C. MORGAN,** | : | |
| Plaintiff, | : | |
| v. | : | Civil Action No. 7:06-cv-50 (HL) |
| **GEORGIA POWER CO.,** | : | |
| Defendant. | : | |

## ORDER

Before the Court is Defendant Georgia Power's Motion for Summary Judgment (Doc. 43). For the reasons set out below, the Motion is granted in part and denied in part.

### I. BACKGROUND

Jowell Morgan is an African American who worked for Georgia Power as a transmission operator beginning in March 1998. He has a degree in electrical engineering technology from Georgia Southern University, and has completed several certificate classes. Plaintiff's supervisors at Georgia Power generally gave him good performance reviews, despite critiques in several areas including

1

challenges in communicating with coworkers and customers.

In June of 2003 Michael Robinson became the supervisor over Plaintiff's division. He soon decided that Plaintiff needed to improve his teamwork, leadership, and communication skills. As a result, he placed Plaintiff on a "development plan" in 2004. Under the development plan, Plaintiff had to demonstrate improvement in his teamwork, leadership, and communication in order to retain his job. As a part of the development plan, Robinson asked Plaintiff to participate in a 360° assessment, which entailed collecting anonymous feedback on Plaintiff's performance from supervisors, co-workers, and customers. In early March 2004, Robinson became concerned that Plaintiff was not committed to the development plan and, pursuant to a manager's recommendation, he arranged for an industrial psychologist to meet with Plaintiff and "help [him] understand and commit to his Development Plan." Robinson Decl. ¶¶ 83-84. Plaintiff claims that Robinson asked his secretary, Arlene Golden, to lie to the psychologist by telling him that Plaintiff was untimely in performing work tasks. Robinson denies this allegation.

Plaintiff repeatedly refused Robinson's requests to participate in the 360° assessment, which he understood to be voluntary. On March 30, 2004, Robinson and Jeff Stancil, a Georgia Power manager, met with Plaintiff. They discussed Plaintiff's refusal to participate in a 360° assessment, and told him that it was "essential" to his development plan. They provided him with a letter that day notifying him that he was on "decision making leave" until the next morning, and he

2

was instructed to use his leave to go home and "decide if [he] wanted to continue [his] employment" with Georgia Power. Morgan Dep. Ex. 44. If he wanted to keep his job, he would have to make a full commitment to the development plan, including the 360° assessment. Plaintiff refused to participate in the assessment, and as a result he was terminated for insubordination the following day.

Plaintiff claims that during his time at Georgia Power, Caucasian operators were treated better than African American operators. He points to Caucasian operators who committed errors and were not fired. He claims that two-thirds of the operators fired from his division during the time he worked for Georgia Power were African American. He identifies a racially offensive statement by Eugene Pavey, a Caucasian employee. Furthermore, Plaintiff applied for a number of promotions while he worked at Georgia Power but was not selected for these positions. He contends that Georgia Power's failure to promote him was the result of intentional discrimination.

Plaintiff seeks relief for violations of the Age Discrimination in Employment Act ("ADEA"), 42 U.S.C.A. § 1983, and Title VII of the Civil Rights Act, and he prays for damages for intentional infliction of emotional distress and conspiracy. In response to the Motion for Summary Judgment, Plaintiff appears to have abandoned a number of his claims. The Complaint states that Plaintiff was discriminated against when he was denied training opportunities. Compl. ¶¶ 42-43. Defendant argued in its brief that the training claims should be dismissed, and Plaintiff did not dispute this

3

argument in its reply. Plaintiff also made claims under the ADEA, but on summary judgment presented absolutely no evidence of a prima facie case of discrimination based on his age. He also makes no arguments in his brief regarding these claims. His claims for age discrimination and discrimination in denial of training opportunities are therefore dismissed.

**II.    ANALYSIS**

**A. Standard on a Motion for Summary Judgment**

Summary judgment is appropriate when there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). In ruling on a defendant's motion for summary judgment, the court takes the facts in the light most favorable to the plaintiff. Stanley v. City of Dalton, 219 F.3d 1280, 1287 (11th Cir. 2000). The initial burden lies on the movant to demonstrate that the nonmovant lacks evidence to support an essential element of its claim. Lowe v. Aldridge, 958 F.2d 1565, 1569 (11th Cir. 1992). The burden then shifts to the nonmovant, who must come forward with some evidence that would allow a jury to find in his favor, even if the parties dispute that evidence. Id. If the evidence that the nonmovant presents, however, is "merely colorable" or "not significantly probative," then summary judgment may be granted. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).

**B. Title VII Termination Claim**

  1. McDonnell Douglas Framework

    (i) Standard

  The United States Supreme Court established the McDonnell Douglas burden-shifting framework in Title VII cases alleging disparate treatment where there is no direct evidence of intent to discriminate. Under this framework, the plaintiff has the initial burden of establishing a prima facie case of intentional discrimination. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133 (2000). To establish a prima facie case the plaintiff must show that: (1) he is a member of a protected class, (2) he suffered an adverse employment decision, (3) his employer treated similarly situated employees who were not African American more favorably than he was treated; and (4) he was qualified to do the job. Burke-Fowler v. Orange County, Fla., 447 F.3d 1319, 1323 (11th Cir. 2006). Defendant disputes the third prong in his termination claim, i.e., it argues that Plaintiff can point to no similarly situated employees outside the protected class who were treated more favorably.

  A plaintiff may meet his burden under the third prong in a Title VII termination claim by presenting evidence that he was either (1) replaced by someone outside the protected class or (2) that the employer applied the work rules more favorably to a similarly situated employee outside the protected class than it did to the plaintiff. See Nix v. WLCY, 738 F.2d 1181, 1185 (11th Cir. 1984). In the second category, the plaintiff must point to an employee who exhibited conduct that was similar to the

plaintiff's conduct, although it does not have to be identical. Anderson v. WBMG-42, 253 F.3d 561, 565 (11th Cir. 2001). The most important considerations in determining whether a comparator is substantially similar are "the nature of the offenses committed and the nature of the punishment imposed." Maynard v. Bd. of Regents, 342 F.3d 1281, 1289 (11th Cir. 2003) (quotation omitted). Providing evidence of an employee who is similarly situated creates an inference of discriminatory intent: if two employees are accused of the same misconduct and the employer treats the member of the protected class less favorably than the non-member, then an inference arises that the real reason for the disparate treatment was discrimination. See Teamsters v. United States, 431 U.S. 324, 358 n.44 (1977).

    (ii) Application

Defendant challenges the absence of any record evidence that Plaintiff was replaced by a Caucasian individual after he was fired; the burden therefore shifts to Plaintiff to come forward with evidence that creates a genuine issue of material fact. Plaintiff argues that "it is unrefuted [sic] that after Morgan's dismissal the next two or three Operators hired were Caucasian." Pl.'s Reply 11. He cites his own deposition and the deposition of Arlene Golden. Plaintiff stated in his deposition, however, that he did not have personal knowledge of who replaced him and that his belief was based on hearsay. As such, it is not appropriately considered on summary judgment. See Macuba v. Deboer, 193 F.3d 1316, 1324-25 (11th Cir. 1999) (holding that hearsay that cannot be reduced to admissible form may not be

6

considered in passing on a motion for summary judgment).

Plaintiff also cites Arlene Golden's testimony in which she stated that an African American women and several other Caucasian operators were hired after Plaintiff was terminated. However, Defense counsel asked her during the deposition "You say you don't know the age or the race of the person who actually filled his position, correct?" Golden Dep. 52:7-8. Golden responded with an unqualified "No." Golden Dep. 52:9. Plaintiff has failed to meet his burden to come forward with evidence that creates a genuine issue of material fact regarding whether he was replaced by a Caucasian after he was terminated.

He next attempts to demonstrate a prima facie case by pointing to non-minority workers who were similarly situated and were disciplined less harshly than he was, because it was the discipline that ultimately led to his termination. Defendant argues that a similarly situated employee is one who refused to commit to his development plan or participate in a 360° assessment; Plaintiff contends that employees who committed errors are similarly situated. He claims that white employees who made switching errors were not terminated, forced to participate in a 360° assessment, or made to meet with a psychologist. Under <u>Maynard</u>, however, the nature of Plaintiff's offense is compared with the nature of the comparators' offenses. According to both Parties, Robinson believed that Plaintiff had poor communication, leadership, and teamwork skills. <u>See</u> Pl.'s Statement of Material Facts ¶ 5; Robinson Decl. ¶¶ 12-17. These deficiencies are qualitatively different

than committing errors on the job. Mistakes may be isolated events or occurrences easily remedied by providing further training or instruction. Plaintiff's own evidence reflects, however, that his superiors had a recurring concern with his ability to communicate. In fact, Plaintiff was eventually terminated for his failure to commit to the development plan designed to address this problem. Plaintiff provided no evidence of a Caucasian employee who committed recurring switching errors, refused to participate in a remedial program, and was disciplined more favorably than he was. He therefore failed to identify a similarly situated comparator.

### 2. "Totality of the Circumstances"

Finally, Plaintiff argues that the "totality of the circumstances" demonstrates an environment "wrought with discrimination." Pl.'s Reply 14. For example, in one incident when a television program made reference to Malcolm X, a Caucasian operator, Eugene Pavey, stated "[t]hey [have] their X and I have mine too." Green Dep. 102:23-104:4. This statement does not create a prima facie case, however. See Mitchell v. USBI Co., 186 F.3d 1352, 1355 (11th Cir. 1999) ("comments by non-decisionmakers do not raise an inference of discrimination, especially if those comments are ambiguous").

There were also various allegations of different treatment between African American and Caucasian employees. On a road trip, the Caucasian operators received a Cadillac rental car, and the African American operators received a "shoddy Grand Am." Morgan Dep. 283:4-10. But the record contains no indication

8

that this was a conscious decision by management, and it appears the disparity was rectified after an employee pointed it out.

One former employee testified that when African Americans made errors, management would speak with them seriously in closed-door meetings, but cited one incident of a Caucasian employee who made an error and had an open door meeting with management that was casual and relaxed. There is no claim, however, that there was any difference in the adverse actions that the employees suffered as a result of the meetings or errors. A prima facie case of discriminatory termination cannot be made out by pointing to a difference in "atmosphere" during meetings with management.

Plaintiff also makes much of the fact that his supervisor asked him to undergo to a psychological evaluation when he refused to participate in a 360° assessment. Without a Caucasian comparator, however, this fact standing alone does nothing to create a prima facie case of discrimination. Although some of the evidence he cites in support of this totality of the circumstances argument may arguably be useful to demonstrate evidence of pretext, Plaintiff must prove a prima facie case of discrimination before evidence of pretext becomes relevant, and he has failed to cross that hurdle in the termination claim.

**B. Title VII Failure to Promote Claims**[1]

### 1. Engineering Representative

To demonstrate a prima facie case of discrimination in Defendant's decision not to promote Plaintiff, Plaintiff must show: he belonged to a protected class, he was qualified for and applied for the position, despite qualifications, he was rejected, and the position was filled with an individual outside the protected class. Vessels v. Atlanta Indep. Sch. Sys., 408 F.3d 763, 768 (11th Cir. 2005). Once the plaintiff has demonstrated a prima facie case, a presumption of discriminatory intent is created and the burden shifts to the employer to demonstrate a legitimate, non-discriminatory reason for the adverse action. This is a burden of production, not persuasion, and it is therefore "exceedingly light." Perryman v. Johnson Prods. Co., 698 F.2d 1138, 1142 (11th Cir. 1983). This evidence must be "sufficient to permit a reasonable fact finder to conclude that the legitimate reasons given by the employer were not its true reasons, but were a pretext for discrimination." Vessels, 408 F.3d at 771. It "must reveal such weaknesses, implausibilities, inconsistencies, incoherencies or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could find them unworthy of credence." Id. (internal quotations and citation omitted).

---

[1] Plaintiff was denied a number of promotions, and Defendant contests that there is evidence of intentional discrimination for any of these decisions. Plaintiff's response addresses only four denials of promotion, therefore the Court concludes he has abandoned the discrimination claims on all but these four denials.

Plaintiff has made out a prima facie case of discrimination with respect to the engineering representative job. The required qualifications for this position were: (1) relevant job experience or a two-year technical or associate's degree with electrical principles and concepts; (2) proven safety-related performance in the candidate's current position; and (3) knowledge of electrical principles and concepts.[2] Plaintiff had an engineering degree that satisfied the first and third requirements, and Defendant does not argue that his safety record made him unqualified for this position. In addition, Plaintiff presented some evidence that a person outside the protected class was chosen for the job,[3] and Defendant presents no evidence to the contrary.

Defendant does identify a legitimate, nondiscriminatory reason for its decision to hire another applicant for the job of engineering representative. The individual who was ultimately hired was deemed to be the most qualified due to his demonstrated initiative, self-motivation, a "strong desire to perform the job," good

---

[2]There were also a number of other subjective criteria listed as job requirements, e.g., capacity to learn various computer applications; good customer service and interpersonal skills; "behavior attributes of Southern Style;" and self motivation in job duties and personal development. However, "to demonstrate that he was qualified for the position, a Title VII plaintiff need only show that he or she satisfied an employer's objective qualifications." Vessels, 408 F.3d at 769. Subjective requirements are therefore not considered in assessing a plaintiff's prima facie case. Furthermore, the job announcement listed several characters that would be considered beneficial, but those are not relevant to the initial, basic inquiry of whether Plaintiff was qualified for the position.

[3]Plaintiff stated in his deposition that "the other applicants [for engineering representative] were all Caucasian." Pl.'s Dep. 329:4-12. There is therefore sufficient evidence to infer that the successful candidate was Caucasian.

work ethic and attitude, successful performance shadowing other engineers, excellent interpersonal and communication skills, and experience in distribution. Brown Decl. ¶¶ 10-12. In contrast, Plaintiff did not have distribution experience or experience working in an engineering position. Because Defendant has satisfied its burden of production of a nondiscriminatory reason for the decision to hire someone else as engineering representative, the burden shifts back to Plaintiff to present evidence that this reason was pretextual. <u>Vessels</u>, 408 F.3d at 771.

An engineering representative is responsible for the "design of electrical services to residential and commercial customers . . . and other engineering responsibilities." Brown Decl. Ex. A. The job also involved interacting with customers and local government officials. Plaintiff held a degree in electrical engineering, while the selectee was a "lineman seeking to become an engineer." Brown Decl. ¶ 10. The successful candidate had only shadowed engineers, although he had demonstrated success in this role.

At least two facts create evidence of pretext. First, there is what appears to be a drastic difference in the objective qualifications between Plaintiff and the person who was ultimately selected. A factfinder could find it implausible that Brown would select a lineman over an engineer for a job that primarily required engineering duties.

Second, Greg Brown, the individual in charge of filling the position of engineering representative, highlighted the successful candidate's intangible

12

qualities, for example communication skills and self-motivation, as reasons why he was the most qualified applicant. Brown's statement, however, indicated that he only knew of Plaintiff's alleged poor communication, interpersonal skills, and self-motivation when he reviewed Plaintiff's record *after* he made the hiring decision. He testified that since the time the hiring decision was made he has reviewed Plaintiff's qualifications and "it is now [Brown's] understanding that Mr. Morgan lacked good communication and interpersonal skills and self-motivation," and that Plaintiff was not as qualified as the candidate who was selected. Brown Decl. ¶ 13. Brown's purported reliance on the value of intangible qualities in choosing an engineering representative contradicts his apparent failure to take into account Plaintiff's own intangible qualities. Sufficient evidence therefore exists to create a genuine issue of material fact regarding whether Brown had a sincerely held belief that the candidate who was selected was better qualified than Plaintiff.

### 2. System operator

Under Title VII, an individual must file an EEOC charge within 180 days of the allegedly unlawful practice. 42 U.S.C.A. § 2000e-5(e)(1). The limitations period begins to run on the date the plaintiff knew or reasonably should have known that the challenged act occurred. Del. State Coll. v. Ricks, 449 U.S. 250, 258 (1980). Chris Weaver, who was in charge of hiring an individual for this position, notified Plaintiff that he did not get the job on July 16, 2003. To meet the 180-day deadline, Plaintiff would have had to file his claim with the EEOC by January 12, 2004. He did

13

not do so, however, until January 30, 2004. Plaintiff's claim for discrimination with respect to the system operator job is therefore untimely.

### 3. Training Instructor

Plaintiff failed to meet his burden to present evidence that he was qualified for the job of training instructor. The job required experience in at least two of the three following job areas: system operations, transmission operations, and substation operations. According to Defendant, Plaintiff only had experience in transmission operations, leaving him unqualified to be a training instructor. Plaintiff argues that his college degree in electrical engineering alone is sufficient to demonstrate he was qualified for this position. There is no evidence, however, that a college degree was required for the job, or that a college degree was the equivalent to experience in two of the three required areas. Because the record contains no evidence that Plaintiff was qualified for the position, he has not made out a prima facie case that Defendant discriminated against him when they did not select him for the job.

### 4. Distribution Control Center Supervisor II

Plaintiff identifies no evidence that shows he was qualified for this position, or even what the requirements for the job were. He therefore fails to establish a prima facie case of discrimination in the decision not to promote him to distribution control center supervisor II. This claim is therefore dismissed.

14

## C. Systemic Disparate Treatment[4]

A plaintiff may establish a pattern and practice of discrimination by using statistical and anecdotal evidence to demonstrate "that discrimination is the company's 'standard operating procedure.' " EEOC v. Joe's Stone Crab, Inc., 220 F.3d 1263, 1273 (11th Cir. 2000) (quoting Int'l Bhd. of Teamsters v. United States, 431 U.S. 324, 335-36 (1977). In this case, Plaintiff points to several pieces of anecdotal evidence, along with statistical evidence that two-thirds of the transmission operators that were fired during the time Plaintiff worked at Georgia Power were African American. (Green Dep. 107-08).

As the United States Supreme Court pointed out in Hazelwood Sch.l Dist. v. United States, however, "what the figures prove obviously depends upon the figures to which they are compared." 433 U.S. 299, 311 (1977). In this case, Plaintiff provides no basis of comparison and no expert testimony of statistical significance. If, for example, two-thirds of the transmission operators who worked at Georgia Power were African American, then there would be no surprise that two-thirds of those fired were also African American. Plaintiff therefore fails to establish a prima facie case of systemic disparate treatment.

## D. Intentional Infliction of Emotional Distress

---

[4]Plaintiff does not make an explicit claim of systemic disparate treatment. He does, however, present some evidence that is appropriately analyzed under this theory, i.e., anecdotal evidence of alleged discrimination involving other employees and statistical evidence.

Plaintiff claims that he suffered emotional distress from "the demand that he submit to a psychological evaluation when no other employees were required to[,] . . . knowing he had been set up by his supervisor who encouraged a fellow employee to lie," and the awareness that he may be fired as a result. Pl.'s Resp. Br. 18. The elements of a claim for intentional infliction of emotional distress are: intentional or reckless conduct that is extreme and outrageous, a causal connection between the conduct and the distress, and distress that is severe. Northside Hosp. Inc., v. Ruotanen, 246 Ga. App. 433, 435 (2000). Furthermore,

> it has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by malice, or a degree of aggravation that would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.

Id.

Even taking the allegations as true, the conduct in this case does not rise to the level of egregiousness required to sustain a claim for intentional infliction of emotional distress. See Beck v. Interstate Brands Corp., 953 F.2d 1275, 1276 (11th Cir. 1992) (holding that discharge for an improper reason does not support a claim for intentional infliction of emotional distress).

### E. Equal Protection

Count Five of the Complaint alleges that Defendant engaged in a conspiracy to discharge Plaintiff and that these "acts constituted an effort to deprive the Plaintiff of equal protection of the laws." Compl. ¶ 50-51. Although Count Five speaks of "Defendants," it is clear that there is only one defendant in this case–Georgia Power. A corporate entity cannot conspire with itself and there is no evidence or allegation of another party with which Defendant conspired. See McAndrew v. Lockheed Martin Corp., 206 F.3d 1031, 1036 (11th Cir. 2000) ("it is not possible for a single legal entity consisting of the corporation and its agents to conspire with itself"). In addition, violations of an individual's constitutional rights are only actionable when a defendant acts under color of law. See 42 U.S.C.A. § 1983 (West 2003). Plaintiff presents no evidence of state action; the claim for conspiracy to violate his constitutional rights must therefore be dismissed. See Appling County v. Mun. Elec. Auth. of Ga., 621 F.2d 1301, 1308 (5th Cir. 1980) (finding no state action in an equal protection claim against Georgia Power).

### F. Stigma

Count Two seeks damages for the stigma Plaintiff was forced to endure on his personal and professional reputation as a result of Defendant's discharging him "for no reason, or at best a pretextual reason." Compl. ¶ 40. He points to no authority under Georgia or federal law that would support such a cause of action and makes no response to Defendant's attack on this claim. The Court therefore concludes that

Plaintiff no longer pursues this claim.

## III. CONCLUSION

The Motion for Summary Judgment is granted with respect to Counts One, Two, Four, Five, and Six. Summary Judgment is denied on the Title VII claim for failure to promote for the position of engineering representative in Count Three, but granted with respect to all other claims.

SO ORDERED, this the 11th day of February, 2008.

*s/ Hugh Lawson*
**HUGH LAWSON, JUDGE**

tch